# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

|  |  |
|---|---|
| CHRISTY DAWN VARDEN et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:15-cv-34-MHT |
| THE CITY OF CLANTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPLY TO DEFENDANT'S RESPONSE TO
## MOTION FOR PRELIMINARY INJUNCTION

There is no dispute concerning the material facts in this case. The City admits that, until the moment a class action lawsuit was filed in this Court, every arrestee of the Clanton Police Department was taken to jail and told that they would be kept there for up to a week before being taken to a court unless they could produce assets of $500 for every charge.

The City makes three categories of arguments. First, it raises issues of standing by making the bizarre claim that the confinement of a person in a jail cell is somehow "not actually" an "injury" to the person, Doc. 24 at 9, so long as the person is not held for more than three days and so long as the person knows anyone who owns land. Second, it argues that, even if the City's entire scheme of post-arrest detention procedures implemented by City employees and agents is flagrantly unconstitutional, it is not the City's fault. This Court should do nothing, the argument goes, because the single person purportedly responsible for the actions of all of the City's employees and agents is immune from suit. Third, the City argues that its scheme of keeping poor arrestees in jail but allowing those with assets to be released immediately is lawful because a few days in jail is not too bad.

## I. Undisputed Facts

The City does not dispute any of the material facts set forth in the Complaint (Doc. 1) and Motion for Preliminary Injunction (Doc. 2). There is no disagreement about the City's post-arrest money-based detention procedures and how they operate for all Clanton arrestees.[1]

The City also correctly explains that the named Plaintiff was released from the City's custody expeditiously, with the assistance of the City's retained counsel, *after* the named Plaintiff filed a Motion for a Temporary Restraining Order in this Court and hours before this Court had scheduled a hearing on that Motion. Further, there is no dispute that, when undersigned counsel went to pick the named Plaintiff up from the jail, she was rebooked on an arrest warrant from Chilton County relating to the same incident. Doc. 24-2 at 2. Because Chilton County seemingly employs an even more onerous "bail schedule," the named Plaintiff was then held on $1,500 bail for two misdemeanor offenses supposedly being separately prosecuted by the County, which she had not sued in this Court. Ms. Varden remained destitute and unable to buy her release. Within an hour, undersigned counsel had coordinated with a third party family member to post land owned by that person in Chilton County to secure Ms. Varden's release from Chilton County's custody. There is no dispute that, under Alabama law, no relative, not even Bill Gates, is under any legal obligation to pledge any amount of property to secure an indigent person's release from jail.

In addition to allowing bail to be posted by landowners, the City also correctly notes that there are for-profit bailbonds companies available for hire in Clanton. The City concedes, however, that in order to hire one of those companies, a person must usually be able to afford 10%

---

[1] The City makes some claims that are inaccurate—such as that there are no monetary fees associated with posting a property bond—but the inaccuracies in the City's Response are not material to the constitutional issue presented by the Motion for a Preliminary Injunction. The other facts surrounding Ms. Varden's arrest at Wal-Mart are as irrelevant to this proceeding as they were to Clanton's generic non-individualized bail schedule. The City also claims that Ms. Varden has been arrested "on a number of occasions," Doc. 24-1 at 3, even though the City admits that it was only on *one* of those occasions that she was able to get a third party to pledge property to secure her release.

of her bond.  There is no dispute that the named Plaintiff had no assets and was clearly indigent under Alabama law.  *See* Ala. Code § 15-12-1(4)(a).   Moreover, for-profit bail bonds companies share the same problem as property bonds from landowners: the arrestee has no control over the decision of the third party.  As Judge Skelly Wright famously explained during the movement to reform federal money bail fifty years ago, the problem with private third-party companies:

> is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fees, remain in jail.

*Pannell v. United States*, 320 F.2d 698, 699 (D.C. Cir. 1963) (Wright, J., concurring).

The City also explains that, although the Complaint accurately described the state of affairs until the moment of this lawsuit's filing, things are now apparently changing.  According to Clanton, it is now "in the process" of "considering" and "formalizing" undescribed and, as of yet, unwritten policies to change the previous system in which impoverished people languished in jail for up to a week.[2]  Doc. 24 at 20.  Based on a facially erroneous interpretation of *State v. Blake*, 642 So. 2d 959, 968 (Ala. 1994), the City argues that its new scheme can still immediately set free those arrestees who have assets so long as the City starts to provide the indigent with an unspecified "individualized determination" within three days.

## II.     The Relief Requested

Something should be said first about the relief requested in this Motion.  The City's assertions about the "logical conclusions" of the relief sought in this Motion are false and misleading.  The City claims that the relief would "remove from the Clanton Municipal Court

---

[2] Despite asking this Court to stay its hand because of the post-lawsuit modification of its illegal activities, the City has not represented *any* details of its changes.  The City has not stated that it is finally prepared to begin using the standard state Affidavit of Substantial Hardship form used by other Alabama jurisdictions to determine indigence. Nor has the City represented that indigent people will be released if they cannot pay or that they will even appear in court or have an opportunity to present evidence.  It has not even described what "alternative methods" it is using. Doc. 24-1 at 2.

judge the authority to make individualized determinations regarding the conditions of release." Doc. 24 at 4. This claim is baffling considering that the one foundational principle of Clanton's existing scheme is its *lack* of "individualized determinations"—by a judge or anyone else. Under the existing scheme, *everyone* is jailed unless they pay, without exception. Or, to put it differently, everyone is deemed eligible for *release*, no matter who they are, what they are charged with, and what they have done in the past—so long as they have $500. All the Plaintiffs are requesting here is that, if the City makes immediate release available to all minor misdemeanor arrestees, it cannot condition that release on whether a person is poor.[3]

The broader point is that there are a number of options available to Clanton that many other jurisdictions around the country use. Numerous courts, commentators, professional organizations, scholars, law enforcement associations, cities, counties, and other groups have designed and implemented simple constitutional alternatives to jailing arrestees because they are poor. For one thing, the City could detain *every* arrestee without monetary bail (as the federal system does) until a prompt initial appearance before a judge. This may be an expensive burden for the City and an onerous one for its residents, and it is understandable why the City has not chosen it. Or, the City could release every misdemeanor arrestee using the same money bail scheme without requiring the bond to be secured, as Alabama law encourages. The City could also release arrestees on their own recognizance (subject to the sanction of a new charge of Failure to Appear), as the Alabama Rules of Criminal Procedure and *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) (*en banc*), both recommend. The Clanton Police could also avoid custodial arrests by issuing citations and summonses for minor municipal offenses, either in person or by presenting evidence to a judge

---

[3] Thus, the City's argument about needing "discretion" to do "individualized determinations" is a red herring. That is not what the City is doing. Even under its proposed reforms to *start* doing unexplained "individualized determinations" within two days, none of it would matter if the person could pay $500.

to procure a summons instead of an arrest warrant, *see* Ala. R. Crim. Pro. 3.1.  Moreover, the City could release every arrestee subject to basic conditions, such as reporting requirements and refraining from committing a new offense.[4]  Alternatively, if the City was intent on keeping its secured money bail system in place, it could give to every arrestee at booking the standard Alabama Affidavit of Substantial Hardship (or a similar form) designed to determine whether arrestees meet the state-law definition of indigence (i.e. whether they are below 125% of the federal poverty line, *see* Ala. Code § 15-12-1).  For indigent arrestees, the City could release them from booking without pre-payment of $500 upon signing a recognizance bond or agreeing to other reasonable conditions.  For non-indigent arrestees, the City could still charge $500 up front.  This scheme might require additional employee expenditures by the City, but it clearly provides the City another lawful option.

But the City cannot do what it has done: carve out release for arrestees with assets and jail for those who are destitute.  This Motion seeks an order that prohibits the City and any of its officers, employees, and agents from implementing an unlawful scheme like that.

### III.    The City's Procedural Arguments[5]

---

[4] The Clanton City Council also has the power to legislate that those subsequently violating those conditions or failing to appear for court be treated differently from other new arrestees.  Under its current system, even those failing to appear can get out of jail and fail to appear again and again, so long as they pay $500 each time.

[5] As a threshold matter, the City argues that the Plaintiffs must meet an "increased" burden because of a supposed distinction between different types of injunctions.  Doc. 24 at 7.  No matter what the evidentiary burden (and the material facts are not even in dispute), if the Plaintiffs are correct on the legal merits, the Plaintiffs are entitled to a preliminary injunction.  This case concerns unlawful jailing of impoverished people because they cannot afford to pay several hundred dollars or, as the City argues, because they cannot pay even 10% of that amount to a private company.  To the extent injunctions serve to preserve the positions of the parties pending a final decision, the Court should preserve a status quo consistent with the likely result on the merits without causing further irreparable harm to Class members during litigation, especially because the City has not contested the other preliminary injunction prongs.

Nevertheless, the City's argument about "mandatory" injunctions is illogical.  First, although the circuits are split about whether "mandatory" injunctions are even coherent as a concept, let alone that they require a vague "increased" showing, this case does not involve a mandatory injunction.  The Plaintiffs simply seek to prevent the City from doing unconstitutional acts to Class members in the future.  The "status quo" is that none of the future Class members are currently in the City's custody.  They will be free until the Clanton Police Department decides to place and keep them in jail.  The relief requested here seeks to preserve that status quo unless and until Clanton is prepared to abide by constitutional procedures for undertaking in that activity.  *See* 11A Charles Alan Wright et al., Federal

5

## A. The Named Plaintiff Clearly Has Standing

First, the City briefly argues that the named Plaintiff lacks standing because, after three days in jail because of her poverty, she was released from City custody pursuant to an agreement between her counsel and counsel retained to represent the City less than 24 hours after filing a federal civil rights lawsuit and within hours of a hearing scheduled by this Court on her Motion for a Temporary Restraining Order.

At the time she filed this action, the named Plaintiff was clearly suffering an injury and therefore had standing. Moreover, it is well established that a defendant cannot moot a class action lawsuit by releasing the named plaintiff from custody. *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975) ("Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted. The individual could nonetheless suffer repeated deprivations, and it is certain that other persons similarly situated will be detained under the allegedly unconstitutional procedures.").

The City next argues that, because the named Plaintiff was in custody less than three days, she did not suffer an "injury." This argument is based on a puzzling interpretation of an Alabama

---

Practice and Procedure § 2948, at 136 (2d ed.1995) (defining the "status quo" as the "last peaceable uncontested status existing between the parties before the dispute developed").

Applying an "increased" burden under the City's theory would give an advantage to the City simply because its officers arrest a person before a person could seek a judicial remedy. Granting the City a higher standard simply because it took action first to alter the "status quo" before litigation would not be consistent with the norms of flexibility and fairness governing the exercise of equitable relief. Moreover, it would treat arrestees for whom arrest warrants have been issued but not served differently from warrantless arrestees because the former could seek an injunction with a theoretically different "status quo." Viewing an injunction as "mandatory" or "prohibitory" thus involves a conceptual choice about which point is used as a baseline frame of reference to determine the "status quo."

Moreover, the rationale for treating "mandatory" and "prohibitory" injunctions differently rests on a shaky foundation of the relative dangers of acts and omissions. Holding "mandatory" injunctions to a higher standard—to the extent one can even tell the difference between the two, *see, e.g.*, *Phillip v. Fairfield Univ.*, 118 F.3d 131 (2d Cir. 1997) (discussing conceptual difficulty in determining the difference between the two in some cases)—assumes that prohibiting someone from doing something is not as onerous as forcing them to do something. But, in many contexts, a more onerous burden is placed on a party by preventing them from taking certain actions than by requiring them to do something. A conceptual legal distinction untethered to the facts of real cases is contrary to the principles of equitable relief injunctions were designed to serve. *See United Food & Commer. Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (refusing to apply different test to "mandatory" and "prohibitory" injunctions).

Supreme Court case that says exactly the opposite. *See Blake*, 642 So. 2d at 968. In any case, calling three days in a jail cell not a sufficient "injury" for constitutional standing purposes because of a (mistaken) belief that such jailing does not ultimately give rise to a constitutional violation, confuses the standing inquiry with the merits. If the City's view of standing were true, no plaintiff could ever have standing if a court eventually ruled that no constitutional violation had occurred.

Finally, the City argues that, because a relative was eventually convinced, after three days, to jeopardize land to secure Ms. Varden's release from *Chilton County* custody, that fact somehow proves that the indigent Ms. Varden has no "standing" to sue the *City of Clanton* because of its post-arrest poverty-based detention procedures. According to the City, Ms. Varden's treatment resulted not from her poverty and not from its own policy of jailing arrestees for up to a week if they are too poor to pay $500, but from "her failure to have the property bond document executed earlier." Doc. 24 at 10.

That argument is both cruel and frivolous. At the time the named Plaintiff filed this federal lawsuit and at the time she was eventually released by the City after this lawsuit, no relative had come forward to post land on her behalf.[6] In any event, whether an indigent person happens to know a friend or relative who possesses land, and whether that person is willing to encumber that land immediately after their friend or relative's arrest, are legally irrelevant. On that theory, any

---

[6] The reasons that the relative could not pledge land to release Ms. Varden for three days are legally irrelevant. Perhaps $2,000 was too much for the person, but $1,500 was worth the risk. Perhaps the relative was so angry at Ms. Varden for getting arrested that the relative was not inclined to help her. Perhaps the relative needed three days to clear title to the property or to obtain a valid deed. The legally relevant facts are that *Ms. Varden* was indigent, that no other person was obligated to help her, and that the City's policy is to keep the indigent arrestee in custody.

In any event, the other cruel (and unstated in the City's Response) reality is that destitute inmates at the Chilton County jail are not permitted to use a free phone to contact relatives, let alone to try to find a relative who possesses real property, let alone to find a relatively immediately willing to jeopardize that land interest to secure their family member's release. Moreover, in order to post a property bond, a relative must be willing to pay a non-refundable $35 fee and be able to present to the jail identification and a copy of the land deed, as well as the copy of a death certificate of any other person on the title to the real property. Thus, the City's irrelevant claim that "she could have chosen" three days earlier to post land "at no cost to herself or others," Doc. 24 at 17, is also untrue.

homeless arrestee, no matter how destitute, could be faulted for not doing enough to convince one of his acquaintances to pay for his release. That is not how equal protection works—it is not based on the fortuity of property owning family members, or on the whims of their mood or on whether they are upset at the arrestee for getting arrested that day. The named Plaintiff was and is indigent, and no relative, friend, or billionaire stranger had any obligation—let alone an immediate obligation within three days—to put up their own land to get her out of jail. She spent three days in jail because of the City's $2,000 secured bond requirement. That she was released three days later when a relative was able to put up land to meet an entirely different $1,500 secured bond imposed by a *different* jurisdiction is irrelevant to her standing to sue the City.

The Defendant's final argument is that, because the named Plaintiff lacks standing, she cannot seek class-wide relief. This argument fails for the same reason: the named Plaintiff has standing because she obviously suffered an injury. As the City concedes, Doc. 24 at 11-12, if Ms. Varden has standing, she can clearly represent the class of people who are arrested by the City and unable immediately to buy their release.

**B. The City Is A Proper Party**

The City next claims that its entire scheme of post-arrest poverty-based detention is the fault of a single person (who happens, the City claims, to be immune from suit). The City argues that the municipal judge "created the bond schedule" and that the City has "no control" over its implementation. Doc. 24 at 12. This argument flies in the face of factual reality and legal principle.

As a preliminary factual matter, the City concedes that, until the moment of this lawsuit's filing in federal court, there was *no written standing order or written policy at all* concerning its

bail schedule.[7] The $500 bail schedule for each charge was just something that City employees did to arrestees without *any* kind of formal judicial order. That should end the matter.

More fundamentally, although every actor involved in the implementation of this illegal scheme is a City employee or agent,[8] although *the City* itself contracts with the Chilton County jail to detain its arrestees (i.e. the Class members) for up to a week before they ever appear before any judge, and although the proceeds from fines, fees, and even bail forfeitures go into the City treasury, the City now suggests that a local lawyer[9] with whom it contracts to be its municipal judge is to blame for thousands of past and future constitutional violations. As noted above, that lawyer is supposedly solely to blame even though City employees and agents implement this unwritten practice openly every day.

It is up to the City to create a scheme for handling its arrestees in a lawful way. The City openly adopted the current policy through the actions of its employees and agents. After using its officers to arrest the Plaintiffs and to decide what charges to bring (and thereby to trigger the bail amount or, in many cases, to decide to release the person with a summons instead of arresting the person and subjecting the person to the bail schedule), the City contracts to hold its arrestees in a detention facility knowing that they are only there because they cannot afford to pay the standard

---

[7] Since the submission of the City's Response, counsel for the Plaintiffs has confirmed with counsel for the City that no written policy or formal standing order existed. Moreover, prior to filing this suit, Ms. Tinsley (the City's affiant) and several other City employees all represented that there was no written policy or standing order concerning a bail schedule. They simply applied $500 per misdemeanor and $1,000 per DUI as a matter of practice in every case. The language used in the City's Affidavit is therefore revealing: Ms. Tinsley states that the "Clanton Municipal Court has implemented" the bail schedule. The "implementation" of this policy, however, was carried out by employees who, like Ms. Tinsley, are salaried employees hired, fired, and managed by the City of Clanton.

[8] The detentions are effectuated at the behest of City police for prosecutions conducted by the City prosecutor in the name of the City, processed by City employees in the clerk's office, and executed by City agents contracted to detain the arrestees until their initial judicial appearance. All of these employees and agents are aware of the illegal bail policy, and they continue to implement that policy in a way that subjects people to those violations.

[9] The part-time Clanton Municipal Judge, John Hollis Jackson III, is the son of the Clanton City Attorney, John Hollis Jackson Jr. The two lawyers also operate a private practice together, Jackson and Jackson, LLP, in downtown Clanton.

money bail.  At that moment, arrestee Class members are *in the custody of the City of Clanton*, who is responsible for making sure that their constitutional rights are not being violated.  The City prosecutor then decides whether to move forward with a case in the name of the City.  The City need not have a police force or make warrantless arrests instead of issuing summonses, *see* Ala. Rl. Crim. Pro. 3.1, it need not employ a prosecutor to evaluate arrests and to decide which cases on which to move forward, it need not have a municipal court, and it need not contract with the County jail to detain the people that its officers arrest.[10]  But if it does, it is responsible for making sure that its employees and agents follow the Constitution.  Again, that should end the matter.

Perhaps most fundamentally, the City appears to argue that a federal court lacks the power to prevent the City's agents from violating the constitutional rights of City residents so long as those agents are acting pursuant to a policy arguably instituted by a municipal court.  That principle would work a radical alteration in American constitutional law.  City employees acting under color of state law have an obligation not to violate the United States Constitution.  If nothing else, federal

---

[10] Independent of these arguments, the City Council also has the legislative authority to set constitutionally adequate rules for post-arrest detention procedures for ordinance violations.  It has failed to do so and has instead adopted the openly practiced bail schedule carried out by its employees.  By way of example, Chapter 12 of the Clanton Code of Ordinances contains many ordinances governing the operation of the City's court, including setting reporting obligations, describing the duties of the City's employees and clerks, setting an extra fee to pay the *City's* costs for its contract to house arrestees at the County jail, setting a list of offenses, fees, and fines to be imposed in the municipal court, and describing procedures for the collection of those payments.  *See* Clanton Ord. Chapter 12, Article 1, § 12-1 *et seq.*

The City's vague separation of powers argument that the municipal court must never be subject to the rules set by the other branches is directly contrary to law and common sense.  *See, e.g.*, *Schoenvogel ex rel. Schoenvogel v. Venator*, 895 So.2d 225, 233 (Ala. 2004) (holding that the legislative branch has authority, so long as it does not violate the Constitution, to determine rules of procedure for the courts).  The Alabama code is full of legislatively mandated court procedures that govern the daily operations of Alabama's courts.  *See, e.g.*, Ala. Code § 15-1-1, *et seq.*  In gesturing at this separation of powers argument, nowhere does the City explain why the City's legislature does not have the ability and the obligation to promulgate lawful procedures for its City court in addition to its police officers.  It would be a hard argument to make considering that the City legislature has done exactly that through a variety of ordinances.  Alabama cities have the power to "adopt ordinances and resolutions not inconsistent with the laws of the state to carry into effect . . . duties conferred by . . . any other applicable provisions of law," Ala. Code § 11-45-1, and the authority to "provide for the safety" and "order" of the "inhabitants of the municipality," *id.*  That "applicable" law must include the Due Process and Equal Protection Clauses of the United States Constitution, and ensuring safety and order for citizens surely includes rules to ensure that people in Clanton are not illegally kept in City jail simply because of their poverty.

courts possess the power—absent doctrines of abstention not applicable here, *see infra* Part V—to prevent local government officials from violating fundamental constitutional rights. *See* 42 U.S.C. § 1983. The City might be right that the municipal court judge could be joined to this case as *another party* responsible for the constitutional violations alleged[11] to the extent that he suggested to City employees that they implement an unwritten practice of requiring $500 secured bail, but that says nothing about whether this Court can and should issue an injunction stopping the *City's employees and agents* from doing their part to effectuate those constitutional violations.

For example, if the municipal court judge issued an informal "bail schedule" stating that all black arrestees would be charged $500 but all white arrestees released for free immediately, this Court would surely have the power under to prevent the City of Clanton and its employees and agents from following that policy in the period of up to a week between an arrest and an initial court appearance.[12]

## IV.    The City Cannot Justify Blanket Jailing of Indigent Arrestees on the Merits

### A.  The City Misunderstands the Equal Protection Analysis

---

[11] The City's argument appears to be a Motion for joinder under Fed. R. Civ. Pro. 19 or 20. Whatever the status of the judge, the City is a "proper party" here because the Plaintiffs can obtain complete relief through an order barring the City and its employees and agents from implementing an unconstitutional policy. Perhaps the City is correct and the judge could also be added under Fed. R. Civ. Proc. 20, but that says nothing about whether this Court can stop the City's employees from effectuating the constitutional violations.

[12] Federal courts routinely order state prison wardens to act to prevent constitutional violations (for example, to release prisoners who are held because of orders issued by state courts). Or, to consider a different example: if a County court had a policy of having its clerks and agents refuse to issue marriage licenses to gay couples, a federal court could surely order those agents to grant those marriage licenses should it determine that the federal constitution required it.

The City cites without explanation *Woods v. City of Michigan*, 940 F.2d 275, 285 (7th Cir. 1991), for the proposition that "neither the City nor its police officers" should be "liable" for following a state court order. Assuming such an order even existed here—and none did—this argument is irrelevant. First, no one is claiming here that individual police officers are liable for enforcing orders that they reasonably believed to be lawful. Whether they deserve qualified immunity is not at issue in this case. Second, the analysis in *Woods* was based on different facts involving a different state's judicial system and concerned whether a City and a County could be liable *for damages*, not whether their agents could be enjoined from implementing an unconstitutional scheme. Most importantly, the Plaintiff in *Woods* pursued only the theory that the state court judge was somehow a "final policymaker" for the City. The Plaintiff did not attempt until a post-trial motion to alter the judgment to argue that the City was liable because its *own* agents had adopted a custom of *enforcing* that judge's illegal order. As a result, *Woods* explicitly held that it would not consider the separate issue of the City's liability for its officers routinely and openly enforcing the illegal order. Thus, *Woods* itself does not even speak to the issue in this case.

The City appears to concede that its old system (i.e. the system that existed until the moment that this lawsuit was filed) of keeping the indigent who could not afford to pay $500 in jail for up to a week prior to a first appearance is unconstitutional. As a result, the City represents to the Court that: "While Clanton, in the past, may not have considered alternatives to bail" it is "in the process" of "formalizing" new procedures. Doc. 24 at 20. These vague assurances, of course, are inadequate to prevent this Court from enjoining the City. Although the City does not cite to the relevant caselaw, it is well established that a defendant's "voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *see also Friends of the Earth v. Laidlaw*, 528 U.S. 167, 189 (2000) ("If it did, courts would be compelled to leave the defendant free to return to its old ways."). For purposes of voluntary cessation, it is worth acknowledging the ugly history that preceded the filing of this lawsuit on January 15: for years, indigent people routinely languished in the Clanton jail every day waiting for an initial court appearance the following Tuesday. In any case, the City's new argument—that it can release those with assets but detain the indigent for up to three days and that it has decided to detain the indigent for only two days going forward—is still unconstitutional.

Based on *State v. Blake*, 642 So. 2d 959, 966-67 (Ala. 1994), the City argues for its new "three day" rule. Under that proposed rule, arrestees with assets would be set free immediately, and indigent arrestees could be held for up to three days before a judicial appearance. How the City arrived at that rule from *Blake* is a mystery, because *Blake* itself condemns it in a lengthy discussion beginning just one page after the portion of *Blake* cited by the City. As explained at length in the Plaintiffs' Motion, Doc. 2 at 10, *Blake* struck down the exact scheme now proposed

by the City on equal protection grounds, finding that jailing the indigent for three days but freeing those with assets prior to an initial appearance lacked any rational justification. *Id*. at 968.

The City does not acknowledge *Blake*'s holding, explain why it was wrongly decided, or mount any argument to counter the force of the equal protection arguments raised by the Plaintiffs. The City cites many of the seminal cases holding that indigent people cannot be kept in jail solely because of their inability to make a monetary payment. Doc. 24 at 21-23. It concludes, however, without explanation, that these cases should not be applied in the pretrial context. *Id.* Given that its entire argument hinges on this point, the absence of reasoning is telling. The best the City can offer is the observation that the situation here is "far removed" from *Bearden* and other equal protection cases about jailing a person who cannot afford to make a monetary payment.

Although the Alabama Supreme Court struck down the City's proposal on rational basis review in *Blake* because it could find no legitimate interest in indiscriminately jailing the indigent for a few days when a person with the same background and same (or more serious) charge would be set free if she had assets, the heightened standard of strict scrutiny applies. As noted in the Plaintiffs Motion, Doc. 2 at 10 n.9, freedom from physical confinement is a fundamental right. *United States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing "fundamental nature of this right" to pretrial liberty); *United States v. Montalvo-Murillo*, 495 U.S. 711, 716 (1990) (holding that release prior to trial is a "vital liberty interest"); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) ("[A] statutory classification based upon suspect criteria or affecting 'fundamental rights' will encounter equal protection difficulties unless justified by a 'compelling governmental interest.'").

In evaluating the federal Bail Reform Act under its heightened scrutiny test for fundamental rights, the Supreme Court found that the federal statute survived because it addressed a "compelling" and "overwhelming" interest of preventing additional pretrial criminal activity by operating "only on individuals who have been arrested for a specific category of extremely serious offenses" and who "Congress specifically found" to be especially dangerous and to pose a "particularly acute problem." *Salerno*, 481 U.S. at 750. Moreover, the Court relied on the numerous aspects of the federal law that made it narrowly tailored, such as that, even as applied only to the most serious federal offenses, it required "a full-blown adversarial hearing," the representation of counsel, and a heightened evidentiary burden of proof. *Id*. at 742, 750. The Court ultimately upheld the law because "Congress' careful delineation" required an *individualized* finding that a *particular* "arrestee presents an identified and articulable threat to an individual or the community." *Id*. at 751.

Blanket detention based on money in minor cases gives no such rigorous individualized process and, as the Alabama Supreme Court found, does not even meet any legitimate state interest. It is impossible to read *Salerno* and believe that the Court would have upheld a new federal bail system in which *all* minor misdemeanor arrestees were detained based on their wealth.

The Ninth Circuit, sitting *en banc*, recently issued a definitive and thorough analysis of this issue in *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 779-81 (9th Cir. 2014) ("We apply heightened scrutiny here because the Proposition 100 laws infringe a 'fundamental' right."). In *Lopez-Valenzuela*, the court confronted an Arizona law that denied bail to all those charged with serious felonies who had illegally entered the United States, without any "individualized determination." In a lengthy and thorough analysis, the court, through a diverse group of judges, explained why

such a blanket rule of pretrial detention could not come close to passing constitutional muster. *See generally id.* at 782-89.

It is important to be very clear about the City's regime that existed prior to the moment this lawsuit was filed: There were no "individualized determinations" or careful exercises of discretion. Nor was there any mechanism to detain a supposedly dangerous defendant who had access to $500 or $50 for a private bailbond. Every arrestee who could pay was released for $500 per charge and every arrestee who was poor was detained. This applied to those with ten failure to appear charges, those who had a history of rape and murder convictions, and those whose only prior history of deviance was a parking ticket.

The City has made a judgment that all minor misdemeanor arrestees are releasable and should not be detained. (This is not unlike the determination in *Bearden* that the proper sentence for an offense was a fine and not jail time). What the City cannot do is operate that scheme such that the poor are jailed—losing their jobs, endangering their children, jeopardizing their health, and suffering in a jail cell for days—while those with assets are freed. That would be, as *Bearden* held, improperly "converting" a monetary condition into a jail term solely because of indigence. *Bearden*, 461 U.S. at 664, 667.[13] There is no compelling (or even legitimate) reason for such a scheme, let alone a carefully tailored response to any vital interest.

The City is correct that "Clanton has an interest in there being an efficient means of releasing defendants," Doc. 24 at 24, but it never explains why the efficient alternatives suggested by *Rainwater*, applied across the country, and adopted by the American Bar Association, the National Association of Pretrial Services Agencies, and every other organizational expert, are

---

[13] While *Bearden* pre-dated *Salerno* and was not formal about labeling the test that it applied, it also applied heightened scrutiny by requiring a "careful inquiry" into the strength of the government's interest in jailing a person balanced with the individual's liberty interest and the other alternative means available to the government of effectuating its interest. *Bearden v. Georgia*, 461 U.S. 660, 666 (1983).

insufficient. Indeed, these alternatives are encouraged by Ala. R. Crim. P. 7.2(a) and the Commentary accompanying that Rule as cited in the Plaintiffs' Motion. *See* Doc. 2 at 12 n.13. The only comment offered by the City is a parade of horribles about an endless cycle of failures to appear. What the City does not mention is that (1) its existing system allows for precisely the same cycle, so long as the person is rich, and (2) no one argues that the City is powerless to craft reasonable rules treating failure to appear cases differently. The City's scary predictions, as unlikely as they may be given the wide body of evidence from other jurisdictions and the studies finding that short post-arrest detention actually *increases* recidivism, Doc. 2 at 18 and n.20, are easily within the power of the City to stop without violating the Constitution.[14]

In the face of widespread condemnation of indiscriminate money bail schedules by judges, scholars, the Department of Justice,[15] and every legal and law enforcement organization to have studied the issue, *see* Doc. 2 at 13-15, 19,[16] their persistence has more to do with lucrative profits for private bonding companies than any legitimate government interests. *See supra* note 16.

---

[14] The City points out that there has been almost no federal litigation concerning the kind of mandatory secured bail schedule used by Clanton. While the academic commentary and professional consensus has condemned such schemes for more than 50 years, some jurisdictions still employ them. For a variety of practical reasons—including that most of those jurisdictions do not provide lawyers to minor misdemeanor arrestees languishing in jail and that it is difficult as a practical matter to mount class action challenges for indigent arrestees—federal courts have not had occasion very often to confront indiscriminate monetary schedules that result in pretrial poverty jailing. That is evidenced by the similar lack of cases *upholding* those schemes.

[15] In addition to the comprehensive Department of Justice reports cited in the Motion, Doc. 2 at 15, 18, Attorney General Eric Holder has addressed these issues at length, continuing the long tradition started by Robert Kennedy:

> Many of these individuals are nonviolent, non-felony offenders, charged with crimes ranging from petty theft to public drug use. And a disproportionate number of them are poor. They are forced to remain in custody—for an average of two weeks, and at a considerable expense to taxpayers—because they simply cannot afford to post the bail required—very often, just a few hundred dollars—to return home until their day in court arrives….
>
> Now, the reality is that it doesn't have to be this way.

Eric Holder, National Symposium on Pretrial Justice (2011) *available at* http://www.justice.gov/opa/speech/attorney-general-eric-holder-speaks-national-symposium-pretrial-justice.

[16] *See, e.g.*, Shane Bauer, *Inside the Wild, Shadowy, and Highly Lucrative Bail Industry*, MOTHER JONES (2014) ("The American Bar Association, the National Association of Counties, the International Association of Chiefs of Police, the National District Attorneys Association, and others have condemned commercial bail as a system that

Although the City accuses the Plaintiffs of being "inflexible" by incorrectly claiming that the Plaintiffs propose only a single way for the City to comply with the Constitution, it is the City's desire to apply the same generic money bail to every arrestee that is inflexible. Numerous other jurisdictions manage to maintain public order without engaging in devastating poverty-based post-arrest detention. To the extent this is inflexible, the City's qualm is not with the Plaintiffs, but with the Fourteenth Amendment. That Amendment places some meaningful limits on our government, particularly when it comes to putting its citizens into jail cells.[17]

### B. The City's Eighth Amendment Arguments Are Misplaced

The City spends a great deal of space arguing that it is not violating the Eighth Amendment and citing to a few federal criminal cases holding that an individually set bail in a particular defendant's case either does not violate the Excessive Bail Clause or is not a violation of the federal Bail Reform Act solely because the defendant cannot pay that amount. As the City itself acknowledges later in its filing, the Plaintiffs' Motion never mentions the Eighth Amendment, and the Plaintiffs' equal protection claim has nothing to do with the Eighth Amendment.

The federal criminal cases cited by the City in its "Eighth Amendment" section, Doc. 24 at 16, all involved *individualized* determinations that a significant monetary bail was required for particular reasons for a particular defendant's serious felony case. Whatever the other (many)

---

discriminates against the poor and places Americans' liberty at the mercy of private businesses."), available at http://www.motherjones.com/politics/2014/06/bail-bond-prison-industry; National Public Radio, *Behind the Bail Bond System* (2010), *available at* http://www.npr.org/series/122954677/behind-the-bail-bond-system.

The New Mexico Supreme Court recently explained the troubling history of American commercial money bail and summarized the scholarly and legal consensus: "Some fifty years ago, widespread concerns about problems and inequities in bail practices sparked national interest in establishing new bail procedures and pretrial programs that would treat the rich and the poor more equitably by facilitating pretrial release without the requirement of monetary bonds." *State v. Brown*, 338 P.3d 1276, 1286; *see also generally* Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. PA. L.REV. 959, 971 (1965); *Preventive Detention Before Trial*, 79 HARV. L.REV. 1489, 1490 (1966).

[17] The City's Response addresses only the question of the likelihood of success on the merits. It does not address, and therefore concedes, the other preliminary injunction factors. Regardless, as the Motion for Preliminary Injunction makes clear, if the Plaintiffs are likely to succeed on the merits of the constitutional violations, the other preliminary injunction factors are easily met in this case. *See* Doc. 2 at 15-22.

problems with the abbreviated reasoning of those cases, they did not condone generalized City-wide monetary amounts levied in all minor misdemeanor arrests without any particularized consideration of legitimate government interests. More importantly, though, they did not consider the Fourteenth Amendment claim raised here.[18]

The City also cites to *Fields v. Henry County*, 701 F.3d 180 (6th Cir. 2012), a case that is both not relevant and shockingly misconceived on its own terms. Again, *Fields* is irrelevant because the issue here was never litigated in *Fields*, and the court never mentions, discusses, or issues any holding relating to an equal protection claim. *Fields* merely held that a schedule used by a County in Tennessee did not violate the *Eighth Amendment*. That should end the matter.[19]

As may become relevant later in this litigation when considering the Plaintiffs' separate Eighth Amendment claim (Count Two of the Complaint) about the arbitrariness and excessiveness of Clanton's indiscriminate bail schedule, *Fields*'s lack of reasoning on that issue is embarrassing.[20] No reasonable reader of *Stack*'s discussion of "individualized" bail could come away with *Fields*'s new vision of categorical bail amounts for "average defendants." *Id*. at 184.

---

[18] Most of those cases also pre-dated *Salerno* and did not consider the potential due process and equal protection arguments, let alone apply the level of scrutiny required by the Supreme Court. The statutory interpretation case from the Eleventh Circuit also explained that an order detaining a person after the person could not afford a bond is "a possibility is not presented to us." *United States v. Wong-Alvarez*, 779 F.2d 583, 585 (11th Cir. 1985). Gesturing at the deeper constitutional problems with such an arrangement, the Eleventh Circuit noted that this "raises a number of difficult questions that we decline to reach in this case." *Id*.

[19] Whether or not there is "nothing inherently wrong with bond schedules," *Fields*, 701 F.3d at 184, is beside the point of this Motion. This case is about *secured* bail schedules operating to detain the indigent. As noted by *Rainwater*, schedules might be convenient for wealthier defendants in a jurisdiction that refuses to provide unsecured bonds or release on recognizance for minor offenses. Or, they could be used in an unsecured fashion to provide a uniform and efficient additional incentive to return to court. But these uses do not save them where they operate inflexibly to detain the poor.

[20] The only two cases on which *Fields* relies either contain either no analysis, are unpublished, do not support the propositions cited, or contain no reasoning. For example, both *Fields* and the City cite *Terrell v. City of El Paso*, 481 F.Supp.2d 757, 766 (W.D. Tex. 2007), for the dramatic proposition that an "exhaustive" search has not found many cases striking down bail schedules. *Terrell* used that lack of cases, and not actual legal reasoning, to justify its holding. Unmentioned is that an "exhaustive search" did not find cases upholding bail schedules either. In fact, *Terrell* itself actually *found* a case striking down a bail schedule *on equal protection grounds* but felt, without explanation, that changes in criminal procedure over several decades somehow made that case less relevant. *See Ackies v. Purdy*, 322 F. Supp. 38, 40 (S.D. Fla.1970). Moreover, the unpublished case of *Glenn v. City of Columbus*, 75 Fed.Appx. 983

Moreover, likely because the Plaintiff argued a procedural due process claim only on the basis of Tennessee state law, *Fields* also strangely held, without discussing *Salerno*, that there was not even *any* state liberty interest at stake in pretrial detention, let alone a fundamental liberty interest. *Id.* at 185. As a result, *Fields* concluded that absolutely no process would ever be required for pretrial detention issues in Tennessee because no protected liberty interest is at stake. This holding is self-evidently contrary to an entire doctrinal wing of American law.

Whatever one thinks about the Eighth Amendment and high bail after individualized adversarial hearings in federal felony cases, certainly there are serious Eighth Amendment problems—as the Supreme Court itself suggested in *Stack*—with generic city-wide cash bail unconnected to any individualized circumstances or findings and determined only by the number of charges that police officers decide to stack after an arrest. *Stack v. Boyle*, 342 U.S. 1, 5 (1951) ("[T]he fixing of bail for *any individual defendant* must be based upon standards relevant to the purpose of assuring the presence of *that* defendant.") (emphases added). *Stack* held that the factors relevant to the amount of bail "are to be applied *in each case to each defendant*." *Id.* (emphasis added).[21] The arbitrariness of Clanton's uniform scheme is apparent: Why $500 and not $400? Why the same amount for all offenses? Why stack money bail for *every* charge initially levied by a police officer? In any event, while those separate arbitrariness problems are alleged in Count Two of the Complaint, they are not the basis for seeking preliminary injunctive relief.

The City eventually acknowledges the binding precedent in this jurisdiction: everyone agrees that indiscriminately jailing the indigent because they cannot pay money bail is unconstitutional. *Rainwater*, 572 F.2d at 1057. The City recognizes *Rainwater* and the force of

(5th Cir.2003), contains no analysis and instead seems predicated on the state offering valid alternatives to money bail by allowing the person to demand to appear before a judicial officer "upon arrest for a misdemeanor."

[21] In explaining the importance of *individualized* bail, *Stack* merely stated that individualized bail set in an unusual amount relative to other cases required particular Eighth Amendment scrutiny. It never condoned generalized bail.

its reasoning. But Clanton was doing exactly that before this lawsuit was filed. It concedes that, until the moment this suit was filed, all indigent people unable to pay for their release or to post real property as a surety were held in jail for up to a week before they ever got any opportunity to have another meaningful alternative considered. Any other arrestee with assets was released immediately. That was the flagrant constitutional violation that the Alabama Supreme Court found in the portion of *Blake* that the City ignores, and that is the Equal Protection violation raised by the Plaintiffs' Motion. The City's Eighth Amendment arguments are a distraction.

**V.     The City's Abstention Arguments Are Foreclosed By Supreme Court Precedent**

The City's abstention arguments are directly foreclosed by Supreme Court precedent. *See Gerstein v. Pugh*, 420 U.S. 103, 107 n.9 (1975) (holding that abstention is inapplicable in a class action challenge to post-arrest detention prior to an initial appearance). Had the City cited the rest of *Pompey v. Broward County*, 95 F.3d 1543, 1550-51 (11th Cir. 1996), it would have been forced to acknowledge to this Court that the abstention principles that it cited are inapplicable in the situation in which a class of Plaintiffs challenges the constitutionality of their detention *prior* to a first state court appearance because, at that point, there is no state proceeding to which to defer. *See id.* It is nonetheless ironic that the City asks this Court to avoid damaging the "integrity" and "independence" of its local legal system by allowing it to engage in unconstitutional behavior that the Alabama state courts have themselves condemned in the strongest terms.

Respectfully submitted,

 /s/ Alec Karakatsanis
Alec Karakatsanis (D.C. Bar No. 999294)
(Admitted *Pro Hac Vice*)

Co-Founder
Equal Justice Under Law

916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org


 _/s/ J. Mitch McGuire_
J. Mitch McGuire (ASB-8317-S69M)

Managing Partner
McGuire & Associates, LLC
31 Clayton Street
Montgomery, AL 36104
(334)-517-1000
http://www.mandabusinesslaw.com


 _/s/Matthew Swerdlin_
Matthew Swerdlin (ASB-9090-M74S)

Matthew Swerdlin, Attorney at Law
1736 Oxmoor Road #101
Birmingham, AL 35209
(205)-793-3517
matt@attorneyswerdlin.com


 __/s/ William M. Dawson__
William M. Dawson (ASB-3976-S80W)

Dawson Law Office
2229 Morris Avenue
Birmingham, Alabama 35203
205-307-7021

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a copy of this Reply Brief has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing upon counsel for the Defendant in this matter:

James W. Porter II
R. Warren Kinney

Porter, Porter & Hassinger, P.C.
P.O. Box 128
Birmingham, Alabama 35201-0128
(205) 322-1744
jwporterii@pphlaw.net, wkinney@pphlaw.net

*/s/ Alec Karakatsanis*
Alec Karakatsanis

Attorney for the Plaintiffs