# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | |
|---|---|
| CHRISTY DAWN VARDEN et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 2:15-cv-34-MHT |
| THE CITY OF CLANTON, | ) (Class Action) |
| Defendant. | ) |

## REPLY TO DEFENDANT'S RESPONSE TO
## MOTION TO CERTIFY CLASS

The City does not dispute the key facts that render this case a prototypical Rule 23 civil rights injunctive class action. The City concedes that it applies a fixed bail schedule that requires all arrestees in the City of Clanton to either produce assets or remain in jail. The City also agrees that many of its arrestees have been and will continue to be unable to post those assets and that those arrestees will continue to remain in jail. Nor does the City dispute that the named Plaintiff was indigent and unable to make the monetary payment required for her release and that she was held in custody by the City for almost three days as a result of her non-payment. Instead, the City raises a number of arguments that are irrelevant and designed to distract attention from the unconstitutionality of its post-arrest detention scheme. This Court should certify a class and put an end to the City's flagrant constitutional violations as soon as possible.

### I.  Preliminary Considerations: An Equal Protection Subclass

As a preliminary matter, the crux of the City's objections have to do with what it perceives as an overly broad class of all Clanton arrestees. Because its money-based post-arrest detention scheme actually "benefits" people with assets, the City argues, a class of all arrestees is

inappropriate. As discussed below, this is the heart of the City's objection on almost every prong of the class action analysis.

The Plaintiffs defined the putative class to include all arrestees because, as the Plaintiffs stated in the Complaint, *see* Doc. 1 at ¶37-38; ¶52-55, and in the Motion for Class Certification, *see* Doc. 4 at 8 n.4, Counts Two and Three of the Complaint raise simple and clear constitutional violations that apply to all arrestees: the generic bail schedule indiscriminately sets bail in an arbitrary way that violates substantive due process and the Eighth Amendment (Count Two); and the closure of the courtroom using armed Clanton police officers when all arrestees appear for public judicial appearances violates the right to open judicial proceedings (Count 3).

The City does not address these claims in its Response, *see* Doc. 32, even though the claims are archetypal class action claims that the City concedes apply to *all* Clanton arrestees. Those constitutional claims satisfy all of the requirements of Rule 23 for the reasons described in the Plaintiffs' Motion. *See generally* Doc. 4.

Because the City focuses its arguments on the equal protection claim for which a preliminary injunction was sought, it essentially argues for a subclass consisting of those arrestees suffering from the equal protection violation alleged in Count One. Almost all of the City's objections would be removed if a subclass were created to include all arrestees unable to fund their release pursuant to Clanton's fixed bail schedule.

The Plaintiffs have no objection and agree to the creation of an equal protection subclass for arrestees unable to fund their release pursuant to the City's fixed bail schedule. *See* Newberg on Class Actions § 7:30 (5th ed.) ("The plaintiffs may subdivide the class in their complaint or in their certification motion, but they are not required to do so, and subclassing may be undertaken at any time. Courts will generally consider subclassing when the need arises."). Indeed, this Court

has the power throughout the course of a case to manage classes and to narrow and redefine appropriate subclasses. *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 407-08 (1980) (holding that the court has the authority but not the obligation to construct subclasses); *see also, e.g., Karhu v. Vital Pharmaceuticals*, 2014 WL 815253, at *11 (S.D. Fla. 2014) ("Of course, the Court need not accept Karhu's proposed class definitions, and may define narrower classes or break them up into subclasses to facilitate the management of the case."); *In re Austrian and German Bank Holocaust Litigation*, 317 F.3d 91, 104 (2d Cir. 2003); *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005); *Burka v. New York City Transit Authority*, 110 F.R.D. 595, 603–04 (S.D. N.Y. 1986) ("The discretion inherent in the Court's power to determine whether a class action may be maintained necessarily requires equally broad discretion in determining, on the motion of a party or sua sponte, whether to create subclasses….").

This case rises and falls on common and important questions of constitutional law concerning a post-arrest system that the City admits to applying across the board. It would be simple to create a subclass of arrestees unable to fund their release pursuant to Clanton's fixed bail schedule within the broader class of all arrestees subjected to the other constitutional violations alleged. The single and dispositive legal question for all subclass members would be: whether the City can, consistent with equal protection, detain arrestees who are unable to fund their release pursuant to the fixed monetary schedule. *See* Statement of Interest of the United States, Doc. 28 at 14 ("Fundamental and long-standing principles of equal protection squarely prohibit bail schemes based solely on the ability to pay. Fixed-sum bail schemes do not meet these mandates…. [I]f the bail system in Clanton is as Plaintiff describes, the system should not stand.").

The relief sought is an order forbidding the City from detaining arrestees unable to produce sufficient assets to secure their release. The Plaintiffs seek a change in City policy to provide

3

procedures that do not result in the jailing of arrestees because of their poverty. All of the arguments concerning Rule 23(a) and Rule 23(b)(2) made in the Plaintiffs' Motion, *see* Doc. 4, apply to the subclass. Indeed, most of the Plaintiffs' Motion already addressed the subclass explicitly. *See, e.g.*, Doc. 4 at 3, 6, 9, 10, 11.[1]

## II. The Rule 23 Factors Are Met

### A. Numerosity

The City does not dispute numerosity. It says that the total number of arrestees is "clearly…large enough," but that the number of arrestees unable to pay bail is "less clear." Doc. 32 at 2. Although the City says that it might take some time and discovery for the City to quantify the *exact* number of people who have been detained until a first court appearance because it would involve a review of "thousands" of past cases, Doc. 32-1 at 1, it does not actually dispute that, whatever the exact number, it is clearly sufficient for Rule 23 numerosity.[2]

The City concedes that there are typically several arrestees every Tuesday who would have been released from the custody of the City of Clanton prior to the court appearance had they produced assets. The important point is that both parties agree that the challenged practice will continue to happen to a large number of arrestees on an ongoing basis indefinitely unless the practice is stopped. *See* Doc. 4 at 3-4; *see also, e.g.*, *Shook v. El Paso County*, 386 F.3d 963, 972 (10th Cir. 2004) ("[M]any courts have found Rule 23(b)(2) well suited for cases where the composition of a class is not readily ascertainable; for instance, in a case where the plaintiffs

---

[1] In any case, the Plaintiffs cited voluminous authority holding that this Court may issue the preliminary injunctive relief sought in this case prior to formally certifying a class action under Rule 23. *See* Doc. 2 at 21 n.24 (citing cases). The City has not contested this authority, and this Court has the power to issue preliminary class-wide relief to prevent ongoing constitutional violations and irreparable harm to impoverished arrestees even if the Court concluded that further discovery or litigation is necessary prior to formal class or subclass certification.

[2] All of the records concerning the exact number of municipal arrestees who have been unable to make bail are in the City's possession, and the parties are working on factual stipulations.

attempt to bring suit on behalf of a shifting prison population."); *Abadia-Peixoto v. U.S. Department of Homeland Security*, 277 F.R.D. 572, 577 (N.D. Cal. 2011) (holding that "ongoing" class of detainees subject to courtroom shackling satisfied numerosity).

Moreover, both parties agree that, because it can often take time for inmates to borrow money or to find a person willing to put up land, there is an even larger number of arrestees who are detained for significant periods of time but who are eventually released upon payment at some point before the following Tuesday. The City rightfully contrasts these arrestees with those who have cash or a credit card or debit card with "sufficient available funds," Doc. 32 at 7, who are released by the City *immediately* after arrest.[3] The City also concedes that many people are detained by the City because they cannot pay cash bail for "failure to appear" charges even though defendants charged with "failure to appear" who have assets are released immediately.[4] As a result, the City is undoubtedly correct not to contest numerosity.

**B. Commonality**

The City's first argument is that it allows arrestees to produce land or to pay a private bonding company instead of paying the full amount of cash set by the bail schedule.[5] As explained

---

[3] A large percentage of Clanton residents do not have such sufficient funds readily available. According to the Census Bureau, nearly a quarter of Clanton residents live below the poverty line. *See* http://quickfacts.census.gov/qfd/states/01/0115136.html.

[4] In a footnote, the City hedges by claiming that some detained people appearing in court are not detained for reasons "directly related" to inability to pay. This claim is misleading. First, the City speculates that some people might be *choosing* to stay in jail. That claim is baffling and also misses the point. The only reason why it might not be "worth the cost," Doc. 32 at 2, for such a person to try to pay for release is that the City *requires* them to pay for their release, and it is a hardship to do so for people with limited means. Second, the City mentions the large number of people held for previous "failure to appear" charges, even though the City admits that these arrestees are forced to pay a strictly cash bail (i.e., they cannot even post property) and that those charged with that crime who are wealthy enough to afford the cash bond are released immediately. Even on the City's own logic of attempting to save its scheme by noting that some arrestees can produce land instead of cash, "failure to appear" arrestees are members of the class because they are only allowed to buy release with cash. Third, the City notes that some inmates have "holds." That is irrelevant because those people are still being held in the custody of the City and are thereby injured because of their inability to buy their release; they cannot be released by the other jurisdiction unless they are released by Clanton.

[5] The City concedes that it requires "failure to appear" arrestees to pay cash up front or be held in jail. Wealthy "failure to appear" arrestees are released immediately on payment. "Failure to appear" in cases involving unpaid debts are a significant percentage of all Clanton arrests. Although not alleged as constitutional violations in this case, Clanton

5

in detail in the Plaintiffs' Reply, *see* Doc. 28 at 2-3; 7-8, this feature of the City's scheme only further condemns it. It is equally unlawful to keep arrestees in jail when they cannot produce land and when they cannot pay even a smaller percentage of their fixed bail to a private company. All those arrestees unable to pay for their release, in whatever format, suffer the same legal violation. Every arrestee jailed because of the inability to pay will benefit from this Court's legal holding that it is unlawful to keep a person in jail when the person cannot produce assets to meet the fixed bail schedule. *See* Doc. 4 at 8-9; *see also, e.g.*, *Toney-Dick v. Doar*, 2013 WL 5295221, at *6 (S.D.N.Y. 2013) (explaining that commonality is met when the resolution of a common contention "is central to the validity of each" class member's claim).

The City's second argument is disturbing. The City speculates that arrestees might have a "variety of reasons" why they are unable to pay the bond. Those reasons range from not being able to find a person to post the money to actually *wanting* to spend time in jail. Doc. 32 at 4. First, the fact that "people arrested may not have a credit, debit card or all the necessary cash on their person," Doc. 32 at 4, is a perfect illustration of the brutality and arbitrariness of the City's bail scheme. The decision about whether to keep a human being in a jail cell should not rest on the fortuity of whether they know and can reach a rich relative or on whether they have a debit card with "sufficient available funds," Doc. 32 at 7, in a checking account at the time of their arrest. Regardless of the reason that various arrestees cannot come up with the money or land, they are all injured by the City's policy of holding them in a jail cell when they cannot pay.

---

routinely engages in many of the same debt-collection practices recently the subject of a lawsuit in this Court, *see Mitchell et al. v. City of Montgomery*, 14-cv-186. In particular, the City has relied heavily on the same private probation company, Judicial Corrections Services, Inc., to collect debts from old Clanton tickets. JCS, Inc. has a notorious track record of illegal activity, including activities relating to having debtors arrested on "failure to appear" warrants that are legally invalid. Those practices are currently the subject of multiple lawsuits in Alabama.

6

The City's speculation that arrestees have "other incentives to stay," Doc. 32 at 4, reflects an outrageous lack of understanding of what it is like to languish in an Alabama jail cell. It is not surprising that a City whose legal system has subjected impoverished people to needless and illegal jailing for years would not appreciate the physical and psychological effects of time in a jail cell.[6] The City's arguments amount to the assertion that we cannot fix its illegal system because we might never know which indigent arrestees have a friend at the ready or which others simply *want* to spend a few days in jail. These arguments are as legally unpersuasive as they are callous.

Every arrestee who cannot come up with the money required by the City is injured by its fixed bail schedule. It does not matter that, for some of them, the barrier was not being able to convince "brothers" to post land and that, for others, the barrier was not being able to convince "husbands" or "friends" to pay cash. *See* Dc. 32 at 5. These manufactured, speculative, and legally irrelevant differences are desperate attempts by the City to avoid a ruling on a clear City policy that keeps the poor in the City's custody every day. The fact is that people are stuck in jail because they cannot, for whatever reason, pay the City's bond. They suffer this consequence every day, and they will continue to suffer until the City's scheme of requiring payment for release is stopped.

**C. Typicality**

The City begins by rehashing its argument against commonality. First, it reiterates the irrelevant claim that Clanton allows people to post land or to hire a private company to post a surety instead of paying the entire amount in cash. As the City concedes, one of the flaws with

---

[6] The City again claims that some inmates are subject to "holds" from other jurisdictions. *See supra* note 4. This was irrelevant to numerosity because there are concededly many detainees who are not subject to "holds." Moreover, the City misunderstands the concept of a "hold." A person detained by the City is unable to be released by the other jurisdiction. Final release from jail is predicated on release from *both* jurisdictions. Thus, a person held by Clanton because of her poverty is still injured because that custody stands in the way of her release. Moreover, a "hold" is merely a designation that, when the person has completed custody for Clanton, she should be "held" for another jurisdiction. Often, the longer the person is kept in the City's custody, the longer she will be kept in custody overall because it takes longer for her to be taken into the custody of the other jurisdiction to resolve the separate charges.

7

this scheme is that it often "depends on the person at issue reaching some third party who can access the funds." Doc. 32 at 7. The City's subsequent concession is a telling advertisement for the cruelty and arbitrariness of its system: Clanton arrestees "are at the mercy of friends' and family members' willingness to obtain the funds for them, bring [those funds] to the jail and assist in bailing them out." Doc. 32 at 7.

The City next argues that the named Plaintiff cannot represent the class of detained arrestees because her injury was "self-inflicted." Doc. 32 at 8. This argument was addressed in the Plaintiffs' Reply to the City's Response to the Motion for Preliminary Injunction. *See* Doc. 28 at 7. This time, recognizing that impoverished inmates are not even allowed free phone calls, *see id.*, the City adds the observation that the named Plaintiff's inability to get out of jail "could well have been the result of an inability to obtain access to someone on the outside who could provide the needed assistance" rather than "the result of any alleged intrinsic inability to take advantage of the system." Doc. 32 at 8. To the extent this argument is even coherent, it is deeply troubling. The City's observation highlights the constitutional problem: it is only because arrestees are forced to come up with assets that many of them are not able to do so. The equal protection violation exists by virtue of the fact that an arrestee who can arrange a payment can get out of jail while an arrestee who cannot arrange a payment cannot. The named Plaintiff is concededly indigent and destitute, and the fact that she was not able to find anyone to produce assets for three days renders her typical of the class of people kept in jail because of their inability to meet the City's bail schedule. The City's claim that it has a valid "standing" defense to the named Plaintiff's claim is frivolous.

The City next challenges standing by reiterating the argument that the named Plaintiff and many other class members are not "injured" for standing purposes if they manage to secure release

8

within three days. This argument was also addressed in the Plaintiffs' Reply. *See* Doc. 28 at 6-7. Unlawful government detention is clearly a concrete injury redressable by a favorable decision on the merits. The City mistakes its position on the merits—that it can hold destitute people in jail for up to three days without violating the Constitution—for an answer to the threshold question relevant to standing: whether people have standing to challenge their own detention on constitutional grounds. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62, (1992) ("When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred … in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

Finally, the City reiterates that arrestees are "quite diverse," Doc. 32 at 10, because people might not be able to come up with money for a variety of reasons and because some people might be held only for hours or days as a result of their inability to pay. The relevance of this argument is difficult to grasp. Everyone agrees that numerous people are held in jail because they cannot come up with enough money to pay for their immediate release pursuant to the fixed schedule. That is the constitutional violation alleged in Count One, and it stands unaffected by the City's attempt to drive a wedge between arrestees held in its custody because of their inability to pay.

The named Plaintiff's injury is unquestionably typical of the injuries of all arrestees who are jailed by the City because they are unable to pay the money bail required by the City's schedule. *See* Doc. 4 at 9-10. A ruling from this Court that a person cannot be kept in a jail cell because of the inability to make a monetary payment would dispose of her claims just as it would those of all other arrestees detained because they cannot produce the scheduled amounts.

9

### D. The Named Plaintiff is an Adequate Representative

The crux of the City's argument is that some arrestees "benefit" from the bail schedule. As noted above, this argument is inapplicable to the subclass of arrestees unable to satisfy the bail schedule, whether by cash, land, or private bonding company. The Plaintiffs have no objection to the certification of an equal protection subclass of arrestees unable to fund their release pursuant to the bail schedule.

The named Plaintiff is clearly an adequate representative of that subclass. In addition to *Pugh v. Rainwater*, 572 F.2d 1053, 1055 n.1 (5th Cir. 1978) (*en banc*), which gave class treatment to a class of "indigent defendants [detained] solely because they were unable to post money bail as a condition of release," a three-judge panel of this Court confronted similar issues when certifying a class of indigent municipal defendants who challenged the requirement that they pay a money bond in order to appeal their cases to the state Circuit Court. In *Tucker v. City of Montgomery Board of Commissioners*, 410 F. Supp. 494, 500 (M.D. Ala. 1976), this Court explained:

> Tucker was convicted in the Municipal Court…. He desired to appeal to the Circuit Court of Montgomery County, but lacked the necessary money to make the bond required by s 587…. This suit was filed July 10, 1974, at which time Tucker was still in jail. Thus at that time a live, sharp controversy was involved, and Tucker had standing to present it. We find that he is the proper representative of a class composed of indigent persons who are convicted in the Montgomery Municipal Court … from which convictions they wish to appeal but are unable to do so because of their financial inability to comply with s 587.

*See also, e.g.*, *Anderson v. Ellington*, 300 F. Supp. 789, 791-92 (M.D. Tenn. 1969) (certifying class of indigent prisoners held in custody because of their inability to pay court costs); *Ackies v. Purdy*, 322 F. Supp. 38, 41 (S.D. Fla. 1970) (striking down bail schedule on equal protection grounds in class action case).

Moreover, even as applied to all arrestees, the City's claim is incorrect. Compared to alternatives used around the country in which release in minor cases is made on recognizance or by an unsecured bond, no one "benefits" by being required to pay the City up front.

### E. Rule 23(b)(2) Is Met

The City's argument concerning Rule 23(b)(2) is again that a class of all arrestees is too broad because rich arrestees are "benefiting" from the current system. A subclass of the arrestees unable to fund their release would clearly satisfy Rule 23(b)(2) for all of the reasons set forth in the Plaintiffs' Motion. *See* Doc. 4 at 13-16. The injunctive relief requested—an order barring the City and its employees and agents from keeping arrestees in jail when they are unable to pay a fixed monetary bail amount—would apply to the entire class.[7]

As a practical matter, the City would be best served by implementing a post-arrest detention system that does not rely on fixed amounts of money—both because systems that do rely on fixed sums raise the serious arbitrariness concerns alleged in Count Two and also because other jurisdictions have found *Rainwater*'s recommended approach (releasing all minor arrestees on unsecured bond or recognizance) to be much more manageable than attempting to collect money bail up front only from non-indigent arrestees. Relying on fixed amounts of money is "bad public policy." *See* Statement of Interest of the United States, Doc. 26 at 10-14. Given the history of entrenched constitutional violations in Clanton, this Court should order the City to release all arrestees without secured fixed money bail until the City can put forward a plan that complies with

---

[7] As explained in the Motion for Class Certification, Doc. 4, the City's procedure by which the indigent are not able to secure release without producing assets is a quintessential example of a government policy generally applicable to an entire class of people. *Amchem Products v. Windsor*, 521 U.S. 591, 614 (1997) ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief where the party opposing the class has acted or refused to act on grounds generally applicable to the class. Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples.") (quotations omitted); *Reid v. Donelan*, 297 F.R.D. 185, 193 (D. Mass. 2014) (certifying class of immigrant detainees when the government denied to all of them the right to an individualized bail hearing); *Kenneth R. ex rel. Tri-County CAP/GS v. Hassan*, 293 F.R.D. 254, 271 (D.N.H. 2013), (certifying class of all persons with serious mental illnesses at risk of unnecessary institutionalization pursuant to allegedly defective state procedures).

the Constitution.  For the purposes of the subclass affected by the equal protection claim sought in the Preliminary Injunction Motion, one possible option for the City would be to submit a plan to comply with that order that kept money bail but sought to determine in ministerial fashion the indigence of arrestees using the standard Alabama Affidavit of Substantial Hardship or other equivalent form.[8]  But the City should be prevented from detaining arrestees at least until it has produced a lawful, workable plan for releasing those who do not have the ability to pay.

                          Respectfully submitted,

                           /s/ Alec Karakatsanis
                          Alec Karakatsanis (D.C. Bar No. 999294)
                          (Admitted *Pro Hac Vice*)

                          Co-Founder

---

[8] Perhaps anticipating such a plan, the City suggests, in a footnote, that Alabama's definition of "indigent" applies only for purposes of determining whether a person can afford a lawyer.  The City's problem, however, lies with the Alabama courts, which apply the same standards of indigence (below 125% of the federal poverty line) outside of the context of appointing counsel, including, for example, to determinations of whether a person can proceed *in forma pauperis* to waive court costs.  *See, e.g., Ex parte Ferrell*, 819 So. 2d 83, 84 (Ala. Crim. App. 2001).  The Alabama Rules explicitly link this standard to all indigence determinations, including determinations of the ability to pay court costs and fines.  *See* Ala. R. Crim. P. 6.3(a) (providing that, for purposes of the Rules of Criminal Procedure, including Rule 26.11(i)(2) prohibiting incarceration of indigent defendants because of their inability to pay, "indigent . . . means a person who is financially unable to pay for his or her defense").

    Moreover the amount of money required for bail often equals or exceeds the amount required for an attorney in minor municipal cases.  Because the City charges $500 per charge for release from jail, the bail required for release is often more than the cost of representation in minor cases.

    Alabama's use of the federal poverty guidelines to define "indigence" is consistent with the baseline standards adopted by other states.  *See, e.g.*, Delaware Chancery Ct. P. X ("When *in forma pauperis* applicants have income and assets at or below 125% of the poverty level as published in the Code of Federal Regulations, their applications shall be approved."); Cal. Gov. Code § 68632 (125%); Minnesota Stat. Ann. § 563.01 (125%); Vermont Rules of Civil Procedure, Rule 3.1 (150%); Idaho Code Ann. § 19-854 (187%); Florida Stat. Ann. § 27.52(2)(a) (200%).  Most of these state standards also provide that a person qualifies if the person receives standard forms of public assistance for the needy.  Most major forms of public assistance also use the federal poverty guidelines.  *See* http://aspe.hhs.gov/poverty/faq.cfm#programs.  The theory behind these standards is simple: a person cannot afford both to make payments and to meet the basic necessities of life.

    This definition squares with long-established federal caselaw distinguishing indigence from utter destitution.  *See Adkins v. E.I. DuPont de Nemours*, 335 U.S. 331, 339 (1948) ("We think an affidavit is sufficient which states that one cannot because of his poverty pay or give security for the costs and still be able to provide himself and dependents with the necessities of life."); *see also Hardy v. United States*, 375 U.S. 277, 289 n.7 (1964) (Goldberg, J. concurring) (quotations omitted) ("Indigence must be conceived as a relative concept.  An impoverished accused is not necessarily one totally devoid of means."); *Anaya v. Baker*, 427 F.2d 73, 74-75 (10th Cir. 1970) (reversing on constitutional grounds when the state court required a person to be a "pauper" with absolutely no money in order to qualify as indigent); *United States v. Cohen*, 419 F.2d 1124, 1127 (8th Cir. 1969) ("But indigency in that sense is not necessarily equatable with destitution."); *United States v. Bursey*, 515 F.2d 1228, 1236 (5th Cir. 1975).

Equal Justice Under Law
916 G Street, NW Suite 701
Washington, DC 20001
(202)-681-2409
alec@equaljusticeunderlaw.org

*/s/ J. Mitch McGuire*
J. Mitch McGuire (ASB-8317-S69M)

Managing Partner
McGuire & Associates, LLC
31 Clayton Street
Montgomery, AL 36104
(334)-517-1000
http://www.mandabusinesslaw.com

*/s/Matthew Swerdlin*
Matthew Swerdlin (ASB-9090-M74S)

Matthew Swerdlin, Attorney at Law
1736 Oxmoor Road #101
Birmingham, AL 35209
(205)-793-3517
matt@attorneyswerdlin.com

*/s/ William M. Dawson*
William M. Dawson (ASB-3976-S80W)

Dawson Law Office
2229 Morris Avenue
Birmingham, Alabama 35203
205-307-7021

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a copy of this Reply Brief has been electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing upon counsel for the Defendant in this matter:

James W. Porter II
R. Warren Kinney

Porter, Porter & Hassinger, P.C.
P.O. Box 128
Birmingham, Alabama 35201-0128
(205) 322-1744
jwporterii@pphlaw.net, wkinney@pphlaw.net

Shannon L. Holliday (ASB-5440-y77s)
Lee H. Copeland (ASB-3461-o72l)

Copeland, Franco, Screws & Gill, P.A.
444 S. Perry Street (36104)
Post Office Box 347
Montgomery, AL 36101-0347
T: 334/834-1180 F: 334/834-3172
Email: holliday@copelandfranco.com
Email: copeland@copelandfranco.com

Counsel for Defendant – City of Clanton

*/s/ Alec Karakatsanis*
Alec Karakatsanis

Attorney for the Plaintiffs